UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FURUKAWA ELECTRIC COMPANY OF NORTH AMERICA; OFS FITEL LLC,<br><br>Plaintiffs,<br><br>v.<br><br>YANGTZE OPTICAL FIBRE AND CABLE COMPANY LTD.,<br><br>Defendant. | Civil Action No.<br>05-cv-11219-RGS |

## DECLARATION OF CRAWFORD CUTTS

CRAWFORD CUTTS, first being duly sworn, deposes and says:

1. I am the President and sole shareholder of Antares Development International, LLC ("Antares"). I make this declaration on personal knowledge in connection with the Motion To Dismiss or, in the Alternative, To Stay Proceedings, to be filed in the above-captioned action by defendant Yangtze Optical Fibre and Cable Company Ltd. ("YOFC").

2. Antares is a Massachusetts limited liability corporation with a principal place of business in Sturbridge, Massachusetts.

3. On June 10, 2005, at Antares's place of business in Sturbridge, I was served with a summons and a copy of a complaint for the above-captioned action.

4. YOFC has no relationship to Antares ("Antares") other than a contractual one. YOFC owns no stake in Antares, and Antares owns no stake in YOFC.

5. I am not an employee or officer of YOFC. No other employee or officer of Antares is, or ever has been, an employee or officer of YOFC.

6.  Attached as <u>Exhibit A</u> is a true and accurate copy of the contract between YOFC and Antares (the "Agreement").  I provide no services to YOFC beyond those called for by the Agreement.  Antares provides no services to YOFC beyond those called for by the Agreement.

7.  Both my and Antares's work for YOFC in Massachusetts has been limited merely to soliciting new customers for YOFC's optical fiber products.  Thus, Antares has engaged in no activities in Massachusetts beyond those for which the Agreement calls.

8.  Antares has always complied with the terms of the Agreement, has forwarded all requests for products to YOFC, and has never attempted to bind YOFC or to set prices, terms, or conditions for the sale of YOFC products.

9.  Antares has never sold any YOFC product into Massachusetts.  Nor has Antares ever attempted to place any orders with YOFC for Massachusetts customers.  Thus, Antares has never provided customer support to purchasers of YOFC products in Massachusetts.

[Remainder of page intentionally left blank]

Signed under the pains and penalties of perjury on this 15th day of July, 2005.

    /s/ Crawford Cutts
Crawford Cutts

# EXHIBIT A

## Antares Development International, LLC.

## SALES REPRESENTATIVE AGREEMENT

This Agreement is made between Antares International Development, LLC (the "Representative") and YOFC (the "Company") ("collectively the parties"). This agreement becomes effective on January 15, 2004.

The parties agree as follows:

1. The Representative is appointed as the exclusive sales representative and shall use its best efforts to solicit, promote, and sell the Company's products as set forth in Schedule 1, Section A (the "Products") to the customers set forth in Schedule 1, Section B (the "Customers") within the geographical area set forth in Schedule 1, Section C (the "Territory"). Representative shall also perform such additional duties, if any, set forth in Schedule 1, Section D.

2. The Representative shall maintain its own office space and facilities and provide and maintain an adequately trained sales organization. The costs of these items are to be borne solely by the Representative. Other than the commission payments set forth in Appendix A and in paragraph 6 below, Representative shall not be entitled to payment for services provided or costs incurred as a result of this Agreement.

3. The Representative's major responsibilities should be as follows:

    (a) To generate and stimulate interest in the Products and furnish information to the Company in regard to market trends and prospective Customers for the Products.
    (b) To Act as a exclusive representative of the Company and promote and sell the Products in the Territory. The Representative will not represent or sell in any way the Products manufactured by any other companies in the Territory within the effective period of the Agreement. In the case that the Representative has been observed and found selling at the same time the Products from manufacturers other than the Company, this agreement will be terminated immediately without giving the written notice to the Representative.
    (c) To Participate in the sales promotion activities to benefit sales of the Products and assist and advises the Company in this regards.
    (d) To Cooperate with and assist the Company with the collection of any overdue accounts and other matters as requested by the Company.
    (e) To protect and promote the name, reputation and goodwill of the Company and its Products.
    (f) To provide the technical support and after-sales service to the Customers periodically.
    (g) Not to sell the Product to any Customer within the Territory if to the knowledge of the Representative that Customer intends to resell the Product in any country which is outside the Territory.

4. The Representative and the Company will cooperate to reach a sales target of no less than 2.5M USD in 2004 and no less than 5 M, 8M and 11M separately in the year 2005, 2006 and 2007. If such a sales target is not realized in a certain year, the two parties will review the situation and revise the target accordingly.

5. Representative shall summarize its sales activities and report to The Company quarterly to assist The Company in formulating its sales strategy in the Territory.

6. The Company shall pay the Representative commissions on all orders from Customers in the Territory for Products that have been shipped and invoiced as follows:

   (a) Unless otherwise agreed by the parties, Commissions shall be paid on the "net sales price" (DDU) stated in the invoice or on a per kilometer basis according to the Commission Rate Schedule attached as Appendix A. "Net sales price" does not include any additional payments made by the Customer, including but not limited to tax, transportation, insurance, special tooling, or special packaging charges.

   (b) A commission invoice from the representative shall be issued to The Company. The Commissions shall be paid via wire transfer within ten (10) days after the later of (i) the date the product is shipped from the Company's facilities and (ii) the date the company receives full payment from the customer.

   (c) The Company may adjust commissions previously paid to the Representative as a result of goods returned for credit. If adjustments are made to the commissions previously paid, the Company may deduct such amounts directly from subsequent commission paid to the Representative. Otherwise, the Representative shall remit to the Company the amount of such adjustments within thirty (30) days of the date of notification by the Company of the adjustments. The Representative shall accept as final the Company's decision regarding such adjustments.

   (d) In cases where a Customer operates branches outside the Territory and billing is made from a central location, the Company may choose to give sales credit based on location of Customers sales rather than billing location. In such cases, the Company shall have absolute discretion in determining the sales basis on which commissions are paid.

7 The Representative shall have no authority to bind the Company in any manner whatsoever. Products shall be sold upon the terms, prices and conditions set by the Company, which may be changed from time-to-time by the Company at its sole discretion. All orders and quotations shall be taken and given in the Company's name. The Company may reject or refuse, in whole or part, any orders or requests for quotations submitted by the Representative. The Company shall have no liability to the Representative for failure to fulfill any order and shall have the sole right to make any and all credit decisions.

8. The Representative acknowledges that it is not a franchisee or dealer within the meaning of any federal or state statute or regulation applicable in the Territory, and hereby waives any claims against the Company under any statute or regulation regarding franchise or dealership practices.

9. This Agreement will remain in force until November 15, 2007 and cannot be terminated for any reason prior to November 15, 2007 subject to the provisions of Article 3 (b) of this Agreement. After November 15, 2007, this agreement shall continue until terminated by either party, for any reason, upon thirty (30) days prior written notice to the other party. The Company shall pay the Representative all commissions that have accrued and are due and owing at the time of termination within thirty (30) days of termination of this Agreement as well as all commissions for sales up to the time of termination.

10. If this Agreement is terminated by either party for any reason, Representative shall be entitled only to the payment set forth in paragraph 6 above, and shall not be entitled to any additional payment, reimbursement or damages, including but not limited to those for: (1) loss of present or prospective sales, goodwill or the value of the business of the Representative; or (2) expenditures, investments, leases or commitments made by the Representative in connection with performance of this Agreement, even if such loss results from reliance on statements made to the Representative by the Company or any of its agents.

11. Representative shall not use or disclose any of the Company's "confidential information" during the term of this Agreement or for a period of two years thereafter. "Confidential information" shall include all non-public information regarding Company's customers, suppliers, and potential acquisition targets; their business operations and structures; their product line design or pricing; their processes, machines and inventions; their research and know-how; their financial data; and their plans and strategies. "Confidential information" does not include information that was known by Representative prior to disclosure; is or becomes available to the public in published literature from a source other than Representative before or during the term of this Agreement; is lawfully obtained by Representative from a third party or parties which did not require Representative to hold the Confidential information or any part thereof in confidence and which did not acquire the Confidential information or any part thereof, directly or indirectly, from the Company under an obligation of confidence; or is released in writing by the Company from the terms of this Agreement. Representative shall return to the Company, upon demand, all documents relating to such information and shall not retain copies of such returned documents. Representative shall return all material furnished to it by the Company, including, but not limited to price books, customers lists and catalogs. The materials shall be returned within thirty (30) business days of termination of this Agreement, or at any other time upon Company's request.

12. This Agreement shall be governed by and construed in all respects in accordance with the laws of the People's Republic of China excluding its choice of laws and rules. The Company represents and warrants to the Representative that this Agreement (a) has been duly authorized, executed and delivered by the Company, (b) is a legal, valid and binding agreement under the laws of the People's Republic of China, and (c) is enforceable in accordance with its terms.

13. Any disputes arising from the execution of or in connection with this Agreement shall be settled through friendly consultation between the parties, If the disputes are not resolved in this manner within sixty (60) days after the delivery by one party of a written notice confirming the existence of the disputes, then the disputes shall be submitted to China International Economic and Trade Arbitration Commission in Beijing for arbitration in accordance with the Commission's arbitration rules in effect at the time of applying for arbitration. The arbitral award is final and binding upon both parties. When any disputes occur and when any disputes are under arbitration, except for the matters under disputes, the parties shall continue to fulfill their respective obligations and shall be entitled to exercise their rights under this Agreement.

14. This Agreement constitutes the entire agreement of the parties concerning its subject matter and supersedes all other oral or written understandings, discussions, and agreements, and may be modified only in writing signed by both parties.

Antares Development International, LLC.
By: _____ 1/18/2005

Accepted this _18_ day of _January_, 2005

YOFC:
By: _____Yan Changkun_____
Title: _____Sales director_____
Date: _____Jan 18, 2005_____

## SCHEDULE 1

<u>Section A:</u> PRODUCTS

All YOFC multimode, single mode and specialty fiber and preforms, rods & tubes

<u>Section B:</u> CUSTOMERS ( excluding Draka Comteq USA)

    1. Optical Cable Corporation
All customers in the territory other than Draka Comteq USA

<u>Section C:</u> EXCLUSIVE TERRITORY
    1. North America
    2. Other countries that are mutually agreed upon by two parties in written form.

<u>Section D:</u> ADDITIONAL DUTIES

    None

## APPENDIX A

## COMMISSION SCHEDULE

## COMMISSION RATE SCHEDULE

### Multimode Fiber and Preforms

The commission rate for all shipments into the Territory in 2004 will be as follows:

1. For all multimode shipments to OCC, the commission rate will be $2.00 USD/km
2. For all multimode shipments to customers other than OCC, the commission rate will be 8% of the DDU price.

The commission rate for all shipments into the Territory after December 31, 2004 will be as follows:

1. For multimode fiber shipped to OCC, the commission rate will be 5% of the DDU price
2. For multimode fiber shipped to customers other than OCC, the commission rate will be 8% of the DDU price

### Singlemode Fiber and Preforms

The commission rate for sales of all singlemode fiber will be $1.00 USD/km from the effective date of this agreement.

All commissions shall be paid via wire transfer within ten (10) days after the later of (i) the date the product is shipped from the Company's facilities or (ii) the date the company receives full payment from the customer.

### Specialty Fiber and Preforms

The commission rate will be 10 % of the DDU price of the specialty fiber products.

### Wire Transfer Instructions

All commissions payable to Representative under this agreement will be made via wire transfer to:

Account Name Holder:  Antares Development International, Inc.
                      Sovereign Bank
                      70 East Main Street
                      Westborough, Mass.  USA

Routing Number: 011075150
Account Number: 72200015401